# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 10, 2012

## STATE OF TENNESSEE v. DEMARICEO CHALMERS

**Appeal from the Criminal Court for Shelby County**
**No. 10-01339     W. Otis Higgs, Jr., Judge**

---

**No. W2011-01274-CCA-R3-CD  - Filed August 22, 2012**

---

Defendant-Appellant, Demariceo Chalmers, appeals as of right his convictions for attempt to commit aggravated robbery and first degree murder committed during the perpetration of an attempted aggravated robbery.  He received a sentence of five years for the attempt to commit aggravated robbery to be served concurrently with a sentence of life imprisonment for the felony murder.  In this appeal, the sole issue presented for our review is whether the evidence is sufficient to support his conviction of felony murder.  Specifically, Chalmers contends that the State failed to prove felony murder because he abandoned his intent to commit the underlying felony prior to shooting and killing the victim.  After reviewing the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Juni Ganguli, (at trial) and Janene Oleaga (on appeal), Memphis, Tennessee, for the Defendant-Appellant, Demariceo Chalmers.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General and Paul Goodman, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On October 11, 2009, Tina Nelson, the victim, was driving home from her sister's house in Frayser, Tennessee.  The victim stopped at a red light at the intersection of North

Watkins and Burnham Street and was accosted by two men. One of the men, later determined to be Chalmers, shattered the driver's side window of the victim's car with his hand and the butt of a gun. The victim screamed and struck Chalmers with a bottle. Chalmers then fatally shot and killed the victim. Within minutes of the offense, Chalmers and one of his co-defendants were apprehended. Chalmers provided a statement to authorities admitting to attempting to rob the victim; however, Chalmers claimed that he did not intend to kill the victim. Chalmers was indicted for felony murder and attempted aggravated robbery. The following proof was adduced at his trial:

Keva Thomas, the victim's sister, testified that October 11, 2009, was the last time she saw her sister alive. Thomas lived on Burnham Street, one block away from North Watkins, and testified that her sister left her house at 8 p.m. that night. Sometime later that evening, a friend of the victim's came to Thomas's home and told her that something had happened. Thomas went to a nearby gas station and saw police cars surrounding her sister's car. She was told that someone had been killed. She identified photographs of the victim alive and deceased.

Officer Onrico Atkins of the Memphis Police Department responded to a shooting call at Watkins and Burnham on the night of the offense. He arrived in the area within a few seconds of the call and could not locate a victim. He continued to search and observed a car at a storefront with its lights on, the door partially ajar, and a person's leg hanging out. Officer Atkins proceeded to the car and found the victim. Her body was laying across the driver's side over to the passenger's side of the car. Officer Atkins said the victim was non-responsive.

Officer Atkins called an ambulance to the scene and began to write his report. By this time, his lieutenant had arrived and was interviewing a witness to the offense. The witness observed the actual shooting and saw "two [male blacks] approach the vehicle. . . . . [in] all dark clothing. One was armed with a gun, and they went running east from the intersection." The witness said they were of "slim build, maybe six feet tall."

Officer Atkins proceeded north on Burnham and turned left onto Donna Street. An unidentified individual who was familiar with the description of the suspects directed Officer Atkins to a location on Donna Cove. Officer Atkins approached two male blacks, one of whom was later determined to be Chalmers, standing in front of a red sports utility vehicle (SUV). Officer Atkins identified himself as a police officer and ordered the men to the ground. The lights in the SUV were on, and Officer Atkins observed a gun in the center console of the rear seat of the SUV. Officer Atkins agreed that Chalmers obeyed all of his commands.

Sergeant James K. Smith of the Memphis Police Department was assigned to the crime scene unit on the night the victim was killed. His primary responsibility was to collect, tag, and secure evidence. Sergeant Smith said there were three different crime scenes involved in this case. The intersection of Watkins and Burnham was the primary scene, the location where the victim's car came to a complete stop and struck a building was the secondary scene, and the location where the suspect's SUV was processed was the third crime scene. Sergeant Smith created a diagram of the first two crime scenes and described them in detail to the jury.

From the primary scene, Sergeant Smith collected a spent .45 caliber shell casing, a piece of glass, and another separate piece of glass from the middle of the intersection, all of which were entered into evidence at trial. Sergeant Smith also photographed the victim's car, with both doors open and the hood up, auto glass from the middle of the intersection at Watkins and Burnham, the victim's property including her wallet, purse, cash, cell phone, and driver's license, and the interior of the victim's car, focusing on the driver's seat and console area. The photograph of the interior of the victim's car depicted the back portion of the driver's seat and the seat-belt with possible blood on it. It also showed glass in the front seat. Sergeant Smith also discussed a photograph of what he described as a "bullet strike" on the passenger side door of the victim's car. Sergeant Smith collected a fluid sample of blood from the driver's side door of the victim's car, placed it in an envelope, and identified the envelope at trial.

Sergeant Smith also processed the third crime scene location at 3831 Donna Drive. He took photographs of the suspect's SUV, which was identified as a GMC Envoy. Photographs of the interior of the SUV showed a skull cap, a piece of cloth, a CD case, and some other clothing. The driver's side of the rear seat showing a black coat with beige interior, two pairs of tennis shoes, and a red article of clothing were also displayed by photograph to the jury. A photograph of the rear passenger seat in front of the console area on the floorboard of the SUV showed the location from which the gun was recovered. Sergeant Smith said that the SUV was transported to the crime scene lab for further processing.

On cross-examination, Sergeant Smith said that a large amount of glass was located at the primary scene. He was only able to collect some of the glass because it was windshield glass and ultimately crumbled to pieces. He acknowledged that none of the victim's belongings were recovered from the third crime scene. Sergeant Smith also observed an odor of alcohol at or near the victim's car and acknowledged that there was a beer bottle by the kick panel of the driver's side of the victim's car.

Dr. Marco Ross, a forensic pathologist and medical examiner with the Shelby County Medical Examiner's Office, testified regarding the victim's autopsy report which was performed on October 12, 2009 at 9:15 a.m. Dr. Ross did not perform the autopsy but had reviewed the report. He identified the deceased, by photograph, at the time of the autopsy. He said the victim was forty years of age, 140 pounds, and 5'4" tall. The toxicology report, which was a part of normal procedure, revealed the presence of ethanol or grain alcohol at a concentration of sixty-two milligrams per deciliter, which was below the legal limit. Dr. Ross described the victim's wounds which were illustrated by photograph. He said the gunshot entry wound was in the upper chest just below the victim's neck, and the gunshot exit wound was on her right shoulder. Because the bullet exited the victim's body, there was no bullet or projectile recovered. The victim also had a gunshot graze wound at the tip of her left index finger.

The path of the bullet perforated and fractured the victim's right clavicle or collarbone, then traveled through the right subclavian artery, which is responsible for the blood supply to the right shoulder and the right arm. The bullet then went through the upper part of the right lung and through the right first rib. The bullet exited the victim's back right shoulder, which caused a hemorrhage into the right chest cavity. Consequently, almost a quart of blood was present in the victim's chest cavity at the autopsy. Dr. Ross opined that the graze wound was consistent with a bullet scraping the victim's hand prior to entering the victim's body. He said this could occur when a victim's hand is in the same location of the body as the bullet enters the body. Based on the report, Dr. Ross opined that the victim died as a result of a gunshot wound to her torso.

On cross-examination, Dr. Ross agreed that the graze wound was also consistent with a person trying to grab a gun, and the bullet scraping their finger. He said, however, if the hand was within a foot or so of the gun he would expect some soot or stippling. He said soot is indicative of a close range of fire, and no soot was visible on the victim's clothes. Dr. Ross further testified that a gunshot residue kit was collected from the victim's hands and released to Sergeant J.T. Max of the Memphis Police Department. On re-direct, Dr. Ross confirmed that no stippling was found on the victim's hands.

Larry Churchill was near the intersection of North Watkins and Burnham on the night of the offense. Between 8:00 and 8:30 p.m., Churchill and his girlfriend, Brandy Coats,[1] drove his pickup truck to a store, located on Burnham, to purchase cigarettes. He testified that the victim's car was "four lanes of traffic across the street." After getting his cigarettes, he entered his truck and began to exit the driveway of the store. He noticed "some guys standing on the corner . . . all dressed in black, and they were kind of fidgety." Churchill had

_____

[1] At the time of trial, Mr. Churchill and Ms. Coats were married.

to cross four lanes of traffic to return home. He said that he was beside the victim's car, with his front bumper toward her front bumper, or traveling in the opposite direction. He said the victim's car was on Burnham, proceeding to Watkins, but was stopped for a red light. He was traveling slow and observed two black males run up to the door of the victim's car. As Churchill's car became even with the victim's car, he saw one of the men "pull[] a gun out[.]" Churchill said that as soon as he pulled the gun out, the gun fired.

Churchill said the men left the victim's car and ran "right in front of him." He followed the men, and observed that they ran across the street behind a library. He continued to follow them to a street that dead-ended into Burnham. Meanwhile, his girlfriend had called the police. Within minutes, he returned to the location of the victim's car, and the police had arrived. The victim's car had rolled across North Watkins, over the curb, and into a building. After advising the police of what he observed, Churchill was shown a photographic display and identified Chalmers as the individual he saw shoot inside the victim's car. Churchill also identified Chalmers as the perpetrator of the offense at trial.

On cross-examination, Churchill conceded that he initially told police that he observed the shooting from his rear-view mirror. He clarified his previous testimony and said that he observed the entire shooting from the side mirror of his truck. He explained that he "saw the whole thing happen as [he] was coming right at [the men]. The whole episode happened as [he] was passing them, and [he] was looking. . . at them through the window. . . mirror. . . keeping an eye on them to make sure that we weren't fixing to be mugged." Churchill also told the police that the two men approached and shot into the passenger side of a black car. Upon being shown a photograph of the victim's car, he acknowledged that it was red. Churchill agreed that the entire event lasted a matter of seconds, but he was certain there were multiple shots fired.

Brandy Coats testified consistently with the testimony of Larry Churchill. In addition, Coats said that as they turned to pass a burgundy car, which was sitting at a red light, she heard a gunshot. She watched the burgundy car as it went through the intersection and hit a wall. She also said she heard three shots. She said she was focused on the car; however, because she thought there might be children in it. She said the car was at the red light, sat there for a couple of seconds, then slowly rolled through the red light over the curb. She was unable to identify any of the perpetrators involved in the offense.

On cross-examination, Coats said the offense occurred at approximately 8:30 p.m. She said their truck was in front of the burgundy car. After she heard a gunshot, she saw two young men dressed in black at the passenger side of the burgundy car, and one of the men was armed. She did not recall exactly who called 911.

-5-

Demar Wells, a crime scene officer with the Memphis Police Department, was called to 201 Poplar to obtain a DNA sample from Chalmers. He took a blood sample from Chalmers' right hand, secured it in an evidence envelope, and identified it at trial. On cross-examination, Officer Wells said that he also transported three gunshot residue kits which had been collected from Joseph Hill, Demariceo Chalmers, and Starkisha Chalmers.

Officer Stacy Milligan of the Memphis Police Department performed additional processing on the victim's car, a burgundy Mercury Sable. He said that the driver's side window of the car had been shot out, with broken glass on the frame of the window and inside of the car. He collected some of the glass from the car, sealed it in an evidence envelop, and identified it at trial. Officer Milligan also collected what appeared to be blood samples from the steering wheel, the handle of the door, and the frame of the car door. He identified various photographs of the interior of the vehicle which contained what appeared to be blood stains. Four DNA samples were collected from the car, specifically from the steering wheel, the driver's seat, the driver's side interior, and the driver's side exterior. He identified the envelope containing the samples at trial.

Officer Milligan also identified a photograph taken of the outside view of the victim's car door. Officer Milligan said this photograph showed a "bullet strike" or where a bullet had struck the door. Based on the bullet strike, Officer Milligan removed the door panel from the victim's car and recovered a bullet slug, which he identified at trial. He described how he recovered the bullet by showing a photograph of the interior of the passenger side door. Based on this, Officer Milligan opined that the bullet slug went through the interior panel of the door and struck the metal part of the door. Another photograph showed where the bullet slug was located within the door panel. On cross-examination, Officer Milligan stated that he also collected a Miller Light beer bottle from the front driver's side floorboard of the car.

Alpha Hinds, a crime scene officer with the Memphis Police Department, processed the suspect's SUV which was recovered from the third crime scene. He identified several photographs of the interior and exterior of the SUV. Specifically, the jury was shown photographs depicting the following: (1) the location of the gun inside the SUV, which was on the rear floorboard behind the driver's seat; (2) the gun after it was unloaded, depicting four rounds in the magazine; (3) an up close view of the ejection port side of the gun depicting blood stains; (4) very fine shard glass which was illuminated by a yellow stick; and (5) a jacket with glass on it.

Officer Hinds identified the gun, bullets, and the magazine recovered from the scene at trial. He said the gun was a Highpoint .45 caliber automatic handgun with four live rounds and one ammunition magazine. Officer Hinds swabbed the red substance from the gun,

placed the swabs in an evidence envelope, and identified it at trial. He further identified a box of clothing collected from the SUV containing a black jacket, a red t-shirt, a navy skull cap, and a red skull cap. A pair of white tennis shoes with what appeared to be a blood stain on the inside of one of the shoes was also recovered from the SUV. Officer Hinds said that shard glass was found on and collected from the driver's front seat of the car and the jacket. He placed the glass in an evidence envelope, which was also identified it at trial.

Memphis Police Sergeant James Max, the case investigator, obtained a statement from Chalmers and requested analysis of certain evidence from the Tennessee Bureau of Investigation (TBI). Sergeant Max retrieved the victim's DNA card and her nail clippings from the Medical Examiner's Office. By consent, Sergeant Max also obtained a DNA sample from Chalmers. Both of these items were forwarded to the TBI for analysis on October 20, 2009. In addition, Sergeant Max forwarded the following items to the TBI for analysis: (1) the .45 caliber spent shell casing, (2) the spent bullet or "bullet slug" collected from the victim's car, (3) the gun, the magazine, and the bullets that were recovered from the SUV; (4) the fluid sample collected by Officer Smith; (5) possible blood DNA from Chalmers that was obtained by Officer Wells; (6) four DNA samples collected by Officer Milligan from the victim's car; (7) four DNA samples obtained by Officer Hinds from the SUV; and (8) the clothes and tennis shoes that were recovered from the SUV.

Within hours of the offense, Chalmers provided a statement to Sergeant Max, admitting to attempting to rob the victim. Prior to the interview, Sergeant Max advised Chalmers of his rights under <u>Miranda</u>, and Chalmers was shown an advice of rights form. Sergeant Max said that Chalmers read the form aloud without any problem. Chalmers said that he understood the form, waived his rights, and agreed to talk with Sergeant Max. Chalmers provided a five-page typewritten statement, which read, in pertinent part, as follows:

[Question]: Are you the person responsible for the death of Tina Nelson?

[Answer]: I guess so.

[Question]: Did you know Tina Nelson?

[Answer]: No Sir.

[Question]: Were you armed with a weapon and if so can you describe it?

[Answer]: Yes sir, an all black .45 automatic

[Question]: Did anyone else participate with you in this incident and if so name them?

[Answer]: Yes sir, Joseph, I don't know the other two dudes names I just met them today, and Carderro[.]

. . . .

[Question]: Was anyone else armed with a weapon?
I think the short dude had a gun, but I never saw it.

[Question]: In detail explain the events prior to, during, and after the incident. Do you understand?

[Answer]: Yes sir.  We met up it was me, Joseph, and my cousin Caderro, and we met up with the other two dudes.  They started talking about what we was doing and they said they were looking for somebody to rob too.  All of us started walking down Watkins from the street by Piggly Wiggly, and the lady pulled up at the red light in a burgundy car like a Ford Taurus.  The little dude said let's get that car right there, and all three of us said alright and ran towards the car.  Caderro said I ain't down with this and ran the opposite way of us because when I tu[r]ned around it was just me, Joseph, and the short dude.  Me, the little short dude, and Joseph, the short dude was on my left side, Joseph was on my right side ran up to the car I busted the driver's window with the gun in my right hand.  The lady she just started hollering, and I can remember she swung like a beer bottle if I'm not mistaken with her right hand because it went all over me.  Then the tip of the bottle hit me in the face and the beer came out all over me.  I jumped back and at the same time she was swinging all of us jumped back and she grabbed the gun at the same time.  Then the gun went off.  We ran.  I didn't know if I shot her.  When the gun went off we ran across the back of the car and we ran to my cousin Starkishi's house.

[Question]: What did you say to the lady after you broke the window out of her car?

[Answer]: I didn't really say nothing. I didn't get a chance.

. . . .

[Question]: Did you mean to shoot the lady in the car?

[Answer]: No sir.

Chalmers's initials were placed at the bottom of each page, and he signed the last page of the statement. The statement was read to the jury and admitted at trial. Chalmers also identified a photograph of Joseph Hill, one of the other perpetrators who was also charged in the offense. On cross-examination, Sergeant Max agreed that Chalmers was remorseful and cried during the statement. He also confirmed that Chalmers had a small cut on his knuckle, but it was not bleeding during the statement. Sergeant Max further acknowledged that Chalmers implicated two other suspects involved in the offense; however, Sergeant Max was unable to substantiate charges against them. On cross-examination, Sergeant Max confirmed that he retrieved the gunshot residue kit performed on the victim's hands from the Medical Examiner's Office.

Special Agent Lawrence James, an expert in forensic biology and serology employed with the TBI, analyzed the evidence forwarded from Sergeant Max. Agent Lawrence said the following items tested positive for blood and were a full match with Chalmers's DNA: (1) the swab recovered from the exterior driver's door of the victim's car; (2) the swab from the exterior port of the gun recovered from the SUV; (3) the substance on the inside of the tennis shoe recovered from the SUV; (4) the red t-shirt recovered from the SUV; and (5) the jacket recovered from the SUV. The skull cap recovered from the back of the SUV tested positive for blood; however, Agent Lawrence was only able to extract a partial DNA profile that was consistent with Chalmers. There was no indication of anyone other than the victim's DNA on the victim's nail clippings or other items collected during the autopsy.

Special Agent Cervinia Braswell, an expert in firearms identification employed with the TBI, examined the gun, four .45 auto cartridges, and the .45 auto magazine recovered from the SUV. She testified that the gun was functioning properly with two safety features, a lever safety and a magazine safety. Agent Braswell said that a person would have to actually pull the trigger, exerting seven pounds of pressure on it, in order for the gun to discharge. Agent Braswell explained that the gun cannot fire with a "finger brush" to the trigger. Agent Braswell said the bullet slug recovered from the victim's car was fired through the gun recovered from the SUV. On cross-examination, Agent Braswell agreed that it was possible for a gun to discharge unintentionally during a struggle.

Chalmers testified on his own behalf. Prior to his arrest, Chalmers was living with his mother and his stepfather. He had graduated from high school and was twenty years old at the time of trial. Chalmers admitted that the gun recovered from the SUV belonged to him. He purchased the gun "a couple of weeks" prior to the offense from "this older dude"

for $80. Chalmers had fired the gun once, the day he bought it. On the afternoon of the offense, Chalmers had been at his aunt's house, located at 3831 Donna Cove, smoking weed with Joseph Hill, a co-defendant, Cardaryl Chalmers, his cousin, and two other unidentified persons. He said the SUV, shown in the various photographs at trial, belonged to Joseph's mother. He had his gun with him when he left his aunt's house, and "walk[ed] around the neighborhood smoking [weed][.]" Chalmers said he was "high." He said that the robbery was not initially his idea, but after it was discussed, they all "sort of agreed to [it]." Chalmers said they discussed robbing someone as they walked to the store to get cigars to smoke more weed. As they were returning from the store, the victim's car pulled up. One of the men said, "Let's get that car right there." Although Chalmers thought all of the group was running to the car, there were only two other men who actually participated in the robbery. Chalmers said he intended to use his gun to rob the people in the car. He was standing on the driver's side of the victim's car, but her window was rolled up. He "threw the gun into the window[,]" and the window broke.

Although the top half of the window broke off, Chalmers insisted that, at this point, he did not cut his finger because his hand "hardly touched the window." He said the robbery did not go as planned because the victim began hollering and threw her hand across the gun. He said, "[the victim] hollered and threw my arm to the side of the window and swung a beer bottle and hit me in my face." At this point, Chalmers said he did not want to go through with the robbery. Chalmers claimed that he and the victim both had their hands on the gun. When the victim threw the gun "to the side with a yank," she pulled Chalmers back at the same time, and the gun went off. Chalmers said the gun discharged once. He said he was never on the passenger side of the victim's car. After the gunshot, Chalmers thought, at most, the victim was shot in the hand. Chalmers said this happened in less than twenty seconds, and his whole life changed.

Chalmers said after the gunshot, he ran to his aunt's house. As he was running, he felt his hand bleeding, looked down, and realized he had multiple cuts. He confirmed that he was wearing a red t-shirt during the attempted robbery, which he used to wrap around his hand to stop the bleeding. He said he was apprehended approximately fifteen minutes after the shooting. He cooperated with authorities and provided a truthful statement. During the interview, Chalmers was told that the victim had died as a result of the shooting.

On cross-examination, Chalmers agreed that he had been smoking weed all day with his friends. Of the five men, he was the only one with a gun. He agreed that the red t-shirt, the black jacket, and the blue cap, previously admitted as evidence, belonged to him. He also explained that the tennis shoe with his blood on it belonged to his co-defendant, Joseph Hill, but the shoe was located next to him in the SUV. He acknowledged that he used illegitimate ways to finance his habit of smoking weed. He said when the victim's car pulled up to the

red light, there were no other cars around. However, he remembered seeing a truck similar to the truck driven by Churchill at the time of the offense. Although Chalmers insisted that the victim's hands were on the gun when the gun discharged, he agreed that his finger was on the trigger.

The jury convicted Chalmers as charged in the indictment. He was sentenced to five years' imprisonment for the attempted aggravated robbery to be served concurrently to life imprisonment for the felony murder. This timely appeal followed.

## ANALYSIS

Chalmers challenges the sufficiency of the evidence supporting his conviction for felony murder. He argues that the State failed to prove that the killing was in furtherance of the attempt to perpetrate a robbery because he abandoned his intent to commit a robbery prior to the shooting. The State contends that the evidence sufficiently supports a conviction of felony murder because the jury heard and rejected Chalmers's defense of abandonment.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

In order to sustain a conviction of first degree felony murder as charged in this case, the State was required to prove "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery. . . ." T.C.A. § 39-13-202(a)(2)(2006 & Supp. 2007). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts. . . ." Id. at (b). Robbery is an "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C. A. § 39-13-401(a)(2006). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

Because Chalmers claims that he abandoned his intent to rob the victim prior to shooting and killing the victim, we must determine whether the proof supporting his felony murder conviction satisfies the felony murder rule. In doing so, we recognize that the felony murder rule applies when the killing is "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879, 883 (1956). "The killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." Id. (quoting Wharton on Homicide, § 126 (3rd ed.)). The killing "may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn.1999).

If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established. State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000). This court has previously considered the following factors when determining the relationship between the underlying crime and the homicide: whether the victim was a witness to the theft-related crime; whether the victim was in close proximity to the crime; and whether the victim was killed because he might have tried to thwart the theft, expose the theft, or interfere in any way with the commission of the theft. State v. Terry, 813 S.W.2d 420, 424 (Tenn. 1991). If these factors, considered in light of the circumstances of the particular incident, reveal a definite break in the chain of events, eliminating the possibility of one continuous transaction from the initial attempt of the underlying felony to the homicide, then the felony murder rule cannot be applied. Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107.

Chalmers contends that he abandoned his intent to commit the underlying felony of attempted robbery prior to shooting and killing the victim; therefore, his felony murder conviction cannot stand. We respectfully disagree. Our review of the evidence presented at trial shows that Chalmers, along with three other individuals, decided to commit a robbery on the day of the offense. Shortly after this decision, they saw the victim's car, with no other cars around it, stopped at a red light. Chalmers ran to the driver's side of the victim's car, observed that her driver's window was rolled up, and busted out the glass window with the butt of a gun. The victim screamed as Chalmers forced his hand inside of her car with the gun and, according to Chalmers, the victim struck Chalmers with a bottle. In response, Chalmers attempted to extract his hand from her car window and retreat from the robbery. While doing so, Chalmers claimed the gun unintentionally discharged. However, a firearms expert testified that the gun was properly functioning with multiple safety features, and that in order for it to discharge seven pounds of pressure must be applied to the trigger. Chalmers conceded that his finger remained on the trigger of the gun during his attempt to rob the victim.

Based on the above proof, we conclude that the underlying felony of attempted aggravated robbery and the killing were part of a continuous transaction with no break in the chain of events. The proof sufficiently established that the killing was committed in pursuance of the attempted aggravated robbery and not collateral to it. After her window was shattered with a gun, the victim attempted to resist her attackers. Chalmers admitted that the robbery did not go as planned, and he panicked. In our view, Chalmers's decision to abandon the attempted robbery occurred simultaneously with the victim's resistance to the attempted robbery. This case illustrates a classic example of the application of the felony murder rule. See Smith v. State, 13 McCanless 499, 209 Tenn. 499, 354 S.W.2d 450 (1961) (stating that "the person who kills another while engaged in committing a felony cannot escape conviction from murder in the first degree, by showing that his intent was not to kill, but to defend his own life or person, or to escape arrest, or to avoid pursuit or death."); see also, People v. Mills, 624 N.E.2d 384, 389-390 (Ill. App. 2 Dist. 1993) (noting that "[c]hief among the inherent dangers of armed robbery is the danger arising from resistance by the victim . . . . [i]t would defeat the purposes of the felony-murder doctrine if such resistance-an inherent danger of the forcible felony-could be considered a sufficient intervening circumstance to terminate the underlying felony or attempted felony."). Moreover, the firearms expert eliminated the possibility that the gun malfunctioned during the struggle or discharged accidentally. Based on the evidence, we conclude that a reasonable jury could have found beyond a reasonable doubt that there was a connection in time, place, and continuity of action between the shooting and the attempted robbery. Accordingly, there is sufficient evidence supporting Chalmers's conviction of felony murder.

We are compelled to note that Chalmers's issue presented in his brief also contends that the evidence supporting the attempted aggravated robbery is insufficient. However, there is no presentation of this issue included within his brief on this issue. Nevertheless, we have reviewed the record and conclude that the proof adduced at trial likewise supports Chalmers's conviction of attempted aggravated robbery. Chalmers is not entitled to relief.

_____
CAMILLE R. McMULLEN, JUDGE